## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JANE DOE NO. 1; JANE DOE NO. 2; JANE DOE NO. 3; WILLIAM MUDD MARTIN HASKELL, M.D.; CASSIE HERR, N.P.; KELLY MCKINNEY, N.P.; and WOMEN'S MED GROUP PROFESSIONAL CORPORATION, | ) ) ) ) ) | CASE NO. 1:20-CV-3247  CIVIL ACTION |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| ATTORNEY GENERAL OF INDIANA; COMMISSIONER OF THE INDIANA STATE DEPARTMENT OF HEALTH; MEDICAL LICENSING BOARD OF INDIANA; INDIANA STATE BOARD OF NURSING; and MARION COUNTY PROSECUTOR, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendants and their employees, agents, and successors in office, and in support thereof allege the following:

## PRELIMINARY STATEMENT

1.      Plaintiffs challenge Indiana laws, Ind. Code §§ 16-21-11-1 to 16-21-11-6; 16-34-2-1.1(a)(2)(H)-(J); 16-34-2-1.1(a)(3)(A); 16-34-2-6(b)-(c); 16-34-3-1 to 16-34-3-6; 16-41-16-4(d); 16-41-16-5; 410 Ind. Admin. Code 35-1-1 to 35-2-1 (collectively, the "Tissue Disposition Laws"), that require healthcare facilities to dispose of embryonic and fetal tissue from abortion and miscarriage management procedures like the remains of a person—by interment or cremation—regardless of their patients' beliefs or wishes.

2.     The Supreme Court has long recognized that: "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life.  Beliefs about these matters could not define the attributes of personhood were they formed under the compulsion of the State." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992).

3.     Likewise, the Supreme Court has long held that: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

4.     The Tissue Disposition Laws violate fundamental tenets of the First and Fourteenth Amendments by compelling abortion and miscarriage patients—and their healthcare providers—to act in accordance with the State's view of personhood—namely, that an embryo is the ontological and spiritual equivalent of a person—regardless of their own opinions about the status of developing human life.  Indiana's effort to create orthodoxy on a deeply polarizing issue that implicates the most profound aspects of religion, culture, and ideology is constitutionally prohibited.

5.     These laws also send the unmistakable message that someone who has had an abortion or miscarriage is responsible for the death of a person.  As a result, they have caused many abortion and miscarriage patients, including Jane Doe Nos. 1, 2, and 3, to experience shame, stigma, anguish, and anger.

6.     To end the constitutional and dignitary harms caused by the Tissue Disposition Laws, Plaintiffs seek a declaration that they are unconstitutional and a permanent injunction against their enforcement. [1]

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 because this case is a civil action "arising under the Constitution, laws, or treaties of the United States," and 28 U.S.C. § 1343(a)(3) because this case seeks to redress the deprivation of federal constitutional rights under color of state law.

8.     At all times relevant herein, Defendants have acted under color of state law.

9.     This Court is authorized to award Plaintiffs' requested relief under 28 U.S.C. § 2201, 42 U.S.C. § 1983, and this Court's general legal and equitable powers.

10.     Venue is appropriate in the Southern District of Indiana pursuant to 28 U.S.C. § 1391(b)(1) because Defendants, who are government officers and agencies sued in their official capacities, operate and perform their official duties in this District.  Venue is also appropriate pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

---

[1] Although most people with the capacity to become pregnant are women, some transgender men and nonbinary people also have the capacity to become pregnant.  *See, e.g.*, Heidi Moseson, *et al.*, *Development of an affirming and customizable electronic survey of sexual and reproductive health experiences for transgender and gender nonbinary people*, 15(5) PLoS ONE: e0232154 (2020), https://doi.org/10.1371/journal.pone.0232154; Juno Obedin-Maliver & Harvey J. Makadon, *Transgender men and pregnancy*, 9 Obstetric Med. 4, 4–6 (2016), https://journals.sagepub.com/doi/pdf/10.1177/1753495X15612658.  The challenged laws violate their constitutional rights as well as women's constitutional rights.

## PLAINTIFFS

### A.  Jane Doe No. 1

11.     In December 2020, Jane Doe No. 1[2] had an aspiration abortion at the Indianapolis clinic operated by Women's Med Group Professional Corporation ("Women's Med" or the "Clinic").  At Ms. Doe 1's request, the Clinic is storing the tissue resulting from her abortion pending the outcome of this lawsuit.  If Plaintiffs prevail, the Clinic will treat and dispose of the tissue by incineration followed by placement in a sanitary landfill.

12.     Ms. Doe 1 was approximately six weeks pregnant at the time of her abortion.  The embryo she was carrying was less than a quarter of an inch in length then according to the Abortion Informed Consent Brochure published by the Indiana State Department of Health ("Health Department").[3]

13.     Ms. Doe 1 works in healthcare.  Her blended family includes several young children who she co-parents with her partner.  She has a history of cervical cancer, and all of her prior pregnancies were medically indicated as high-risk.

14.     Because of her medical history and the size of her family, Ms. Doe 1 does not want to have any more children.  Last year, at age thirty, she sought a tubal ligation, but her obstetrician-gynecologist ("ob-gyn") at the time refused to perform the procedure because he thought she was too young to make that decision and might regret it in the future.

15.     Ms. Doe 1 used to think of herself as opposed to abortion, but when she became pregnant this year, she knew that it was the right decision for her and her family.

---

[2] This is a pseudonym.

[3] *See* Ind. State Dep't of Health, Abortion Informed Consent Brochure (2020) ("Abortion Informed Consent Brochure") at 2 (indicating that, at six weeks of pregnancy, an embryo is approximately four to six millimeters in length), https://www.in.gov/isdh/files/Abortion_Informed_Consent_Brochure.pdf.

16.     Ms. Doe 1 learned about the Tissue Disposition Laws during her counseling appointment at Women's Med, which took place three days before her abortion procedure.  The counseling about burial and cremation made her feel like the State was pressuring her to view the embryo she was carrying as a person.  She believed that she was making a moral decision—one that was in the best interests of her family—but the State-mandated counseling seemed designed to make her feel like a bad mother.  She felt like the State was overriding her moral authority and forcing its own moral code on her, instead.  The experience was stigmatizing and shaming, and it compounded the pain of an already difficult moment.

17.     Disposing of the tissue herself is not an option for Ms. Doe 1.  She does not have any training or expertise in the proper disposal of untreated human tissue, and the idea of having to dispose of the tissue without assistance from the Clinic caused her additional anguish.

18.     A judgment that allows Ms. Doe 1 to authorize Women's Med to dispose of the tissue from her abortion procedure through standard medical means would affirm her moral agency to make decisions about her pregnancy and family that are in alignment with her own beliefs.

19.     Following her abortion, Ms. Doe 1 found a new ob-gyn willing to perform a tubal ligation.

**B.  Jane Doe No. 2**

20.     In November 2020, Jane Doe No. 2[4] had an aspiration abortion at the Women's Med Clinic in Indianapolis.  At Ms. Doe 2's request, the Clinic is storing the tissue resulting from her abortion pending the outcome of this lawsuit.  If Plaintiffs prevail, the Clinic will treat and dispose of the tissue by incineration followed by placement in a sanitary landfill.

---

[4] This is a pseudonym.

21.     Ms. Doe 2 was approximately six weeks pregnant at the time of her abortion.  The embryo she was carrying was less than a quarter of an inch in length then according to the Abortion Informed Consent Brochure published by the Health Department.[5]

22.     Ms. Doe 2 is a stay-at-home mom with a three-month old son.  Her previous pregnancy was extremely difficult.  She was diagnosed with hyperemesis gravidarum, which entails extreme, persistent nausea and vomiting throughout pregnancy.  It caused her to vomit more than ten times per day.  She had to be treated with intravenous fluids once or twice per week, and at one point she had to be hospitalized for a week.  She lost ten percent of her bodyweight and experienced constant weakness and fatigue.  Individuals who have hyperemesis gravidarum during their first pregnancy are at increased risk of developing the condition during future pregnancies.

23.     When Ms. Doe 2 became pregnant again soon after giving birth, she did not think that she would be physically able to endure carrying the pregnancy to term, and she worried that the pregnancy would hamper her ability to care for her infant son.  After discussing the situation with her husband, she decided to have an abortion.

24.     As a faithful Muslim, Ms. Doe 2 has complex feelings about abortion.  She knows, however, that she and her husband are good people, and that ending her pregnancy was the best decision for their family.

25.     Ms. Doe 2 learned of the Tissue Disposition Laws during her counseling appointment at Women's Med, which took place five days before her abortion procedure.  She found the requirements deeply offensive.  The State-mandated counseling and certification form made her feel like she was being forced to admit to killing someone, even though that is not how she viewed her abortion.  Her own conscience told her that she was preventing potential life at its

---

[5] *See* Abortion Informed Consent Brochure at 2.

earliest stages from developing into an actual human being, not ending the life of a person who already existed.  The State's effort to override her conscientious beliefs was demeaning and stigmatizing.  It left her pride and self-esteem diminished and filled her with a deep sense of anguish.

26.     Disposing of the tissue on her own, without assistance from the Clinic, is not a realistic option for Ms. Doe 2.  A layperson with no relevant training or expertise, she does not know how to transport or dispose of the untreated tissue properly to avoid environmental contamination and violation of local sanitation laws.

27.     A judgment that allows Ms. Doe 2 to authorize Women's Med to dispose of the tissue from her abortion procedure through standard medical means—rather than by interment or cremation—would be a form of vindication.  It would affirm that her views about personhood and abortion are entitled to at least as much respect as those of the politicians who enacted the Tissue Disposition Laws.  And it would insulate her beliefs about matters of conscience from interference by the State.

**C.  Jane Doe No. 3**

28.     In December 2020, Jane Doe No. 3[6] had an aspiration abortion at the Women's Med Clinic in Indianapolis. At Ms. Doe 3's request, the Clinic is storing the tissue resulting from her abortion pending the outcome of this lawsuit. If Plaintiffs prevail, the Clinic will treat and dispose of the tissue by incineration followed by placement in a sanitary landfill.

29.     Ms. Doe 3 was approximately six weeks pregnant at the time of her abortion. The

---

[6] This is a pseudonym.

embryo she was carrying was less than a quarter of an inch in length then according to the Abortion Informed Consent Brochure published by the Health Department.[7]

30.     Ms. Doe 3 does not want to have children.

31.     A few years ago, Ms. Doe 3 was diagnosed with cervical intraepithelial neoplasia. The treatment for this precancerous condition left her with a short, compromised cervix.  She developed complications following the procedure, which required treatment in a hospital emergency department for excessive bleeding.  Because of the condition of her cervix, Ms. Doe 3's recent pregnancy was considered high risk.  Her gynecologist recommended cervical cerclage, a surgical procedure that involves using sutures or synthetic tape to reinforce the cervix, if she wanted to continue her pregnancy.

32.     Prior to her abortion, Ms. Doe 3 was experiencing side effects from the pregnancy, including nausea, fatigue, and anxiety, that were making it difficult for her to work.  Ms. Doe No. 3 is a cosmetologist, which requires her to be on her feet all day.

33.     All of these factors contributed to Ms. Doe 3's decision to have an abortion.

34.     Ms. Doe 3 is a practicing Baptist. She strongly supports abortion rights, and as a matter of religious conviction, she believes that personhood begins at birth.

35.     Ms. Doe 3 learned about the Tissue Disposition Laws during her counseling appointment at Women's Med, which took place three days before her abortion procedure.  She found the requirements to be bizarre, disturbing, and out of step with her own beliefs about abortion and personhood.  In particular, she felt that the State was compelling her to certify that abortion ends the life of a person, a message that she believes to be both false and intentionally stigmatizing.

---

[7] *See* Abortion Informed Consent Brochure at 2.

She also felt that the requirements were seeking to impose the State's religious views on her, which made her very uncomfortable.

36.     The Tissue Disposition Laws require Ms. Doe 3 to act in violation of her religious and conscientious beliefs.  She believes that prior to birth, a developing embryo or fetus is not a person and should not be treated like a person. She therefore believes that embryonic and fetal tissue should be treated and disposed of like any other human tissue resulting from a medical procedure; burial and cremation are rites that should be reserved for the disposition of deceased persons.

37.     Ms. Doe 3 did not want to take the tissue home with her and dispose of it herself because she felt that doing so would be dangerous and impractical. She does not know the proper way to dispose of untreated human tissue and is concerned about disposing of it in an unsanitary manner.  Moreover, she felt that having to walk past the crowd of anti-abortion protesters that regularly gather outside the Clinic while carrying the untreated tissue from her body would be shameful and insulting to her.

38.     A judgment that allows Ms. Doe 3 to authorize Women's Med to dispose of the tissue from her abortion procedure through standard medical means would affirm her moral agency to make decisions about her pregnancy that are in alignment with her religious and conscientious beliefs.

**D.  William Mudd Martin Haskell, M.D.**

39.     William Mudd Martin Haskell, M.D., is a physician licensed to practice medicine in Indiana and Ohio.

40.     Dr. Haskell owns Women's Med and has served as its Medical Director for nearly twenty years.  He supervises the medical staff and treats patients at both Women's Med clinics,

including the Clinic in Indianapolis.  The care he provides to Indianapolis patients includes medication abortion, aspiration abortion, and miscarriage management.

41.     Dr. Haskell is committed to providing patient-centered care.[8]

42.     Dr. Haskell is responsible for ensuring that Women's Med complies with all applicable laws, including the Tissue Disposition Laws.

43.     As a physician who provides abortion care and the owner of Women's Med, Dr. Haskell is subject to criminal liability as well as civil fines for violating the Tissue Disposition Laws.  Ind. Code §§ 16-34-2-7(c), 16-37-3-16, 16-41-16-10(a), 16-41-16-11.

44.     In addition, as a licensed healthcare practitioner, Dr. Haskell is subject to professional discipline for violating the Tissue Disposition Laws.  Ind. Code § 25-1-9-4(a)(3).

45.     Dr. Haskell sues on behalf of himself and his patients.

**E.  Cassie Herr, N.P.**

46.     Cassie Herr, N.P., is a nurse practitioner licensed to practice in Indiana.

47.     Ms. Herr works at Women's Med, where she provides pre-abortion and follow-up care to abortion patients.  Her responsibilities include providing the counseling mandated by the Tissue Disposition Laws and ensuring that patients sign the required certification form.  In addition, she provides contraceptive care.

48.     Ms. Herr is committed to providing patient-centered care.

49.     As a licensed healthcare practitioner, Ms. Herr is subject to professional discipline for violating the Tissue Disposition Laws.  Ind. Code § 25-1-9-4(a)(3).

50.     Ms. Herr sues on behalf of herself and her patients.

---

[8] NEJM Catalyst, *What is Patient-Centered Care?* (Jan. 1, 2017), https://catalyst.nejm.org/doi/full/10.1056/CAT.17.0559.

**F.  Kelly McKinney, N.P.**

51.     Kelly McKinney, N.P., is a nurse practitioner licensed to practice in Indiana.

52.     Ms. McKinney works at Women's Med, where she provides pre-abortion and follow-up care to abortion patients.  Her responsibilities include providing the counseling mandated by the Tissue Disposition Laws and ensuring that patients sign the required certification form.  In addition, she provides contraceptive care.

53.     Ms. McKinney also serves on the staff of a hospital in Indianapolis, where she is part of the internal medicine team working in behavioral health.

54.     Ms. McKinney is committed to providing patient-centered care.

55.     As a licensed healthcare practitioner, Ms. McKinney is subject to professional discipline for violating the Tissue Disposition Laws.  Ind. Code § 25-1-9-4(a)(3).

56.     Ms. McKinney sues on behalf of herself and her patients.

**G.  Women's Med Group Professional Corporation**

57.     Women's Med has operated a licensed abortion clinic in Indianapolis for nearly twenty years.  It provides first-trimester medication and aspiration abortions.  In addition, the Clinic provides contraceptive services and treatment for miscarriage.

58.     Women's Med also operates a healthcare facility in Dayton, Ohio, which provides a similar set of services.

59.     Women's Med is subject to licensure penalties and civil fines for failing to comply with the Tissue Disposition Laws.  *See* Ind. Code § 16-41-16-10(b); *see also* Ind. Code 16-21-3-1; 410 Ind. Admin. Code 26-2-8(a).

60.     Women's Med sues on behalf of itself and its Indianapolis patients.

11

## DEFENDANTS

### A.  Attorney General of Indiana

61.     The Attorney General of Indiana ("Attorney General") is sued in his official capacity.  The Attorney General has broad powers to enforce Indiana's criminal laws, including the Tissue Disposition Laws.  *See* Ind. Code. § 4-6-1-6 ("[T]he attorney general shall consult with and advise the several prosecuting attorneys of the state in relation to the duties of their office, and when, in the attorney general's judgment, the interest of the public requires it, the attorney general shall attend the trial of any party accused of an offense, and assist in the prosecution."); *State v. Harper*, 8 N.E.3d 694, 698 n.4 (Ind. 2014) ("The Attorney General has the exclusive right and duty to represent the State in all criminal appeals.").  The Office of the Attorney General maintains its headquarters in Indianapolis, which is located in this District.

### B.  Commissioner of the Indiana State Department of Health

62.     The Commissioner of the Health Department ("Commissioner") is sued in her official capacity.  The Health Department is responsible for licensing and disciplining healthcare clinics that provide abortion care.  Ind. Code §§ 16-21-2-2.5, 16-21-2-10, 16-21-3-1; 410 Ind. Admin. Code 26-2-8, 26.5-3-8.  The Health Department's office is in Indianapolis, which is located in this District.  The Commissioner is authorized to impose licensure penalties and civil fines on healthcare facilities that violate the Tissue Disposition Laws.  *See* Ind. Code § 16-41-16-10(b); *see also* Ind. Code 16-21-3-1; 410 Ind. Admin. Code 26-2-8(a).

### C.  Medical Licensing Board of Indiana

63.     The Medical Licensing Board of Indiana ("Medical Board") is sued in its official capacity.  The Medical Board is responsible for licensing and disciplining physicians.  Ind. Code §§ 25-0.5-11-1, 25-0.5-11-5, 25-1-9-1, 25-1-9-4, 25-22.5-2-7.  The Medical Board's office is in Indianapolis, which is located in this District.  The Medical Board is authorized to take disciplinary

12

action against licensed physicians who violate the Tissue Disposition Laws.  *See* Ind. Code § 25-1-9-4(a)(3).

### D.  Indiana State Board of Nursing

64.     The Indiana State Board of Nursing ("Nursing Board") is sued in its official capacity.  The Nursing Board is responsible for licensing and disciplining nurses, including nurse practitioners.  Ind. Code §§ 25-0.5-11-1, 25-0.5-11-6, 25-1-9-1, 25-1-9-4, 25-23-1-1, 25-23-1-7.  The Nursing Board's office is in Indianapolis, which is located in this District.  The Nursing Board is authorized to take disciplinary action against licensed nurses who violate the Tissue Disposition Laws.  *See* Ind. Code § 25-1-9-4(a)(3).

### E.  Marion County Prosecutor

65.     The Marion County Prosecutor is sued in his official capacity.  He has statutory authority to prosecute crimes in Marion County, where Indianapolis is located.  *See* Ind. Code § 33-39-1-5.  The Marion County Prosecutor's office is in Indianapolis, which is located in this District.  The Marion County Prosecutor has the authority to prosecute abortion providers, including Dr. Haskell, for violating the Tissue Disposition Laws.  *See* Ind. Code §§ 16-34-2-7(c), 16-37-3-16, 16-41-16-11.

## FACTUAL ALLEGATIONS

### A.  Beliefs About Developing Human Life

66.     The medical community measures the gestational age of a pregnancy in weeks from the start of a pregnant person's last menstrual period ("LMP").  When a sperm fertilizes an egg, the resulting entity is known as a zygote.  Fertilization typically occurs during the second or third week LMP.  Over the next few days, the zygote's cells divide to form a blastocyst.  Pregnancy begins when a blastocyst successfully implants in the lining of a person's uterus, typically during the fourth week LMP.  At five weeks LMP, the blastocyst becomes an embryo.  The embryonic

stage of pregnancy continues through ten weeks LMP.  At eleven weeks LMP, the embryo becomes a fetus.  Quickening, or the point in pregnancy when a pregnant person can feel fetal movement, typically occurs between fourteen and twenty weeks LMP.  A fetus generally becomes viable, meaning that it could survive indefinitely outside the uterus, at twenty-four weeks LMP. A pregnancy reaches full term at forty weeks LMP.

67.     People hold diverse beliefs about the status of developing human life, including the point at which a developing entity becomes a "person" or takes on a special status that distinguishes it from other human tissue.

68.     People's views about developing human life are influenced by many factors, including religion, science, culture, ideology, and personal experience.

69.     For some people, the point at which a developing entity takes on a special status depends on physical benchmarks, such as fertilization, implantation, quickening, viability, or birth. Others point to spiritual benchmarks, such as ensoulment.  These benchmarks vary both among and within religious and cultural traditions.  Many people's beliefs about developing human life are also shaped by personal experience, including with prior pregnancies, miscarriages, and abortions.

70.     These beliefs shape people's opinions about acceptable disposition methods for embryonic and fetal tissue.

**B. Abortion, Miscarriage, and In-Vitro Fertilization**

71.    Abortion is a common medical intervention. Nearly one in four American women will have an abortion by age forty-five.[9]  Last year, 7,637 abortions took place in Indiana.[10]

72.    People decide to have abortions for diverse, often complex, and interrelated reasons, including limited financial resources; unsupportive or abusive partners; and the demands of work, school, or existing dependents.[11]

73.    Most people who have abortions are already parents.  Over sixty percent of individuals who had an abortion in Indiana last year previously gave birth to a child.[12]

74.    The vast majority of abortions occur before or during the embryonic stage of pregnancy.  Last year, more than eighty-five percent of Indiana abortions occurred prior to eleven weeks LMP.[13]

75.    Most abortion patients (sixty-two percent) are religiously affiliated.  Fifty-four percent are Christians and eight percent are affiliated with other religious traditions.[14]

76.    Three-quarters of abortion patients in the United States are low-income, with nearly half living below the federal poverty level.[15]  The federal poverty level for an individual is

---

[9] Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008–2014*, 107 Am. J. Pub. Health 1904, 1906–08 (2017).

[10] Indiana State Dep't of Health, Terminated Pregnancy Report 2019 (June 30, 2020) ("Health Dep't 2019 Report")    at    2,    https://www.in.gov/isdh/files/2019%20Indiana%20Terminated%20Pregnancy%20Report.pdf.

[11] *See, e.g.*, Lawrence B. Finer et al., *Reasons U.S. Women Have Abortions: Quantitative and Qualitative Perspectives*, 37 Perspectives on Sexual & Reprod. Health 110, 112–18 (2005).

[12] Health Dep't 2019 Report at 12.

[13] *Id.* at 13.

[14] Jenna Jerman et al., *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008*, Guttmacher Institute 7 (May 2016),   https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf.

[15] *Id.*

currently an annual income of $12,760; the federal poverty level for a family of four is currently an annual income of $26,200.[16]

77.     In Indiana, abortion is virtually unavailable after the first-trimester of pregnancy (*i.e.*, the first thirteen weeks of pregnancy as measured by LMP) because of a statute mandating that abortions be performed in a hospital or ambulatory outpatient surgical center after the first trimester.  *See* Ind. Code § 16-34-2-1(a)(2)(B).  Last year, only forty second-trimester abortions were performed in Indiana, all in acute care hospitals.[17]

78.     Indiana hospitals generally do not provide abortion care unless maternal or fetal indications are present, and the cost of having an abortion in a hospital is thousands of dollars— and in some cases tens of thousands of dollars—more than having an abortion in a clinic. Accordingly, very few abortions are provided in Indiana hospitals.  Last year, of the 7,637 total abortions that were provided in Indiana, 52 were provided in hospitals, and 7,585 were provided in abortion clinics.[18]

79.     There are currently only seven abortion clinics in Indiana, and only five of them offer aspiration abortion.[19]

80.     Two methods of abortion are commonly used in the United States during the first trimester of pregnancy: medication abortion and aspiration abortion.

81.     Medication abortion entails the administration of medications that end a pregnancy and cause the uterus to expel its contents.  This method may be used from the start of pregnancy

---

[16]  U.S. Dep't of Health and Human Services, *2020 Poverty Guidelines* (Jan. 21, 2020), https://aspe.hhs.gov/2020-poverty-guidelines.

[17] Health Dep't 2019 Report at 13, 15.

[18] *Id.* at 15.

[19] *Id.*

through ten weeks LMP.  Patients are instructed to take the first medication—mifepristone—immediately, and the second medication—misoprostol—twenty-four to forty-eight hours later.  Patients typically begin to expel the pregnancy one to four hours after taking the misoprostol in a process that resembles a heavy menstrual period or early miscarriage.

82.     Although an aspiration abortion is sometimes referred to as a "surgical abortion," it does not involve an incision into the body.  Instead, a provider inserts a thin, flexible tube into a patient's uterus and uses gentle suction to remove its contents.

83.     Last year, approximately forty-four percent of first-trimester abortions in Indiana were medication abortions, and fifty-six percent were aspiration abortions.[20]

84.     A Committee of the National Academies of Sciences, Engineering, and Medicine ("Committee") recently issued a Consensus Study Report on the Safety and Quality of Abortion Care in the United States after surveying the relevant literature.  It concluded that abortion in the United States is safe; serious complications of abortion are rare; and abortion does not increase the risk of long-term physical or mental health disorders.[21]

85.     The Committee assessed the quality of abortion care based on six factors: safety, effectiveness, patient-centeredness, timeliness, efficiency, and equity.  It concluded that the quality of abortion care depends to a great extent on geography.  In particular, it found that "[i]n many parts of the country, state regulations have created barriers to optimizing each dimension of quality care."[22]

---

[20] *Id.* at 2.

[21] Nat'l Acads. of Scis., Eng'g, and Med., *The Safety and Quality of Abortion Care in the United States* 1–16 (2018), https://doi.org/10.17226/24950.

[22] *Id.* at 10.

86.     In a recent decision striking down a pair of Texas abortion restrictions, the Supreme Court likewise concluded that abortion is safe and complications from abortion are rare.  *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2311, 2315 (2016).  Indeed, the Supreme Court found that abortion is safer than many other procedures commonly performed in outpatient settings.  *See id.* at 2315.  It also recognized that unnecessary regulation may diminish the quality of care that patients receive.  *See id.* at 2318.

87.     Notably, abortion entails significantly less medical risk than carrying a pregnancy to term and giving birth.[23]

88.      Miscarriage is the spontaneous loss of a pregnancy.

89.     Miscarriage is a common occurrence.  About ten percent of clinically recognized pregnancies end in miscarriage.[24]   The incidence of miscarriage is significantly higher when pregnancies not yet clinically recognized are taken into account.

90.     Most miscarriages occur early in pregnancy.  Approximately eighty percent of miscarriages occur during the first trimester.[25]

91.     Someone experiencing a miscarriage may not require medical treatment.  But if a miscarriage is incomplete—*i.e.*, some pregnancy tissue remains in the uterus—it may be treated with medications or an aspiration procedure comparable to medication or aspiration abortion.

---

[23] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 216–17 (2012).

[24] Am. Coll. of Obstetricians & Gynecologists, ACOG Practice Bulletin No. 200:  Early Pregnancy Loss 1 (2018),  https://www.acog.org/-/media/project/acog/acogorg/clinical/files/practice-bulletin/articles/2018/11/early-pregnancy-loss.pdf.

[25] *Id.*

92.     Many people who have abortions or miscarriages experience stigma, which in turn causes feelings of guilt and shame.[26]

93.     In vitro fertilization ("IVF") is a method of assisted reproduction that involves combining an egg with sperm in a laboratory dish.  If the egg is fertilized and begins cell division, an embryo will develop.  That embryo may be transferred into a patient's uterus for it to implant in the uterine lining and begin a pregnancy.

94.     IVF providers typically attempt to fertilize several eggs at a time and transfer one to three embryos at a time.  Embryos that are not immediately transferred are typically frozen, which halts the development process, and stored for possible future transfer.

95.     IVF patients may choose to have frozen embryos transferred to their own bodies to attempt pregnancy; they may donate them to others; or they may direct providers to thaw and dispose of them.

### C. The Tissue Disposition Laws

96.     In contemporary medicine, the standard method for treating and disposing of human tissue and other pathological waste by incineration followed by placement in a sanitary landfill.  Indiana law also permits treatment of human tissue by steam sterilization, chemical disinfection, thermal inactivation, and irradiation.  Ind. Code § 16-41-16-3.

97.     The Tissue Disposition Laws prohibit healthcare facilities from treating and disposing of embryonic and fetal tissue through these standard methods at no additional cost to their patients.  Instead, the laws give abortion and miscarriage patients two options: (1) they may agree to let healthcare facilities treat their embryonic and fetal tissue like the remains of a person,

---

[26] *See* Danielle Campoamor, *Meghan's royal miscarriage story underscores broader problem of reproductive stigma*, NBC News (Nov. 28, 2020), https://www.nbcnews.com/think/opinion/meghan-s-royal-miscarriage-story-underscores-broader-problem-reproductive-stigma-ncna1249153.

and have it interred or cremated; or (2) they may take possession of the biohazardous tissue themselves and bear the cost of disposing of it in a manner that does not signify personhood.

98.     As originally enacted, the Tissue Disposition Laws were not as onerous.  Indiana enacted the earliest provisions in 2014.  Pub. L. 127-2014, 2014 Ind. Acts 1472.  They simply gave miscarriage patients the right to arrange a burial or cremation following pregnancy loss at any gestational age and clarified what permits and other paperwork would be necessary.  *See id.*

99.     Indiana expanded the Tissue Disposition Laws in 2015 to give abortion patients an analogous right.  Pub. L. 113-2015, 2015 Ind. Acts 829.  The 2015 enactment also directed the Health Department to adopt rules "specifying the disposal methods to be used by abortion clinics and health care facilities to dispose of aborted fetuses."  *Id.* § 4, 2015 Ind. Acts at 830.  The rules subsequently adopted permitted healthcare facilities (including abortion clinics) to utilize "incineration as authorized for infectious and pathological waste" as a means of treating and disposing of embryonic and fetal tissue.  410 Ind. Admin. Code 35-1-3.  Patients who believe that this is the most appropriate way to dispose of embryonic and fetal tissue could rely on their healthcare providers to effectuate their wishes without encountering logistical burdens or additional costs.

100.     In 2016 and again in 2020, Indiana adopted requirements that were significantly more burdensome.  Collectively, these amendments to the Tissue Disposition Laws prohibited standard medical disposition of embryonic and fetal tissue as an option for healthcare facilities, instead requiring them to cremate or inter the tissue, and made it difficult and costly for abortion and miscarriage patients to choose a disposition method that does not signify personhood.  *See* Pub. L. 213-2016, 2016 Ind. Acts 3099; Pub. L. 77-2020, 2020 Ind. Acts 465.

101.    Then-Governor Mike Pence signed the 2016 amendments into law in March 2016 with a prayer.[27]  A District Court in this District enjoined enforcement of the amendments before their scheduled effective date, holding that they lacked a rational basis.  *See Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 265 F. Supp. 3d 859, 870-72 (S.D. Ind. 2017).  The Seventh Circuit affirmed the injunction, *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 302 (7th Cir. 2018), but the Supreme Court reversed, *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1782 (2019) (per curiam).  The Supreme Court confined its decision to the limited issue of whether the amendments satisfied rational basis scrutiny.  *Id.*  It expressly declined to address whether the amendments imposed an undue burden on the right to abortion.  *Id.*  Following the Supreme Court's decision, the 2016 amendments took effect in September 2019.

102.    Governor Eric Holcomb signed the 2020 amendments into law in March of this year.  The amendments' author, Senator Liz Brown, published an op-ed in the Indy Star explaining the purpose of the legislation.[28]  After stating her belief that "human life begins at fertilization," she stated that, "by the passage of SB 299, we are making it clear in Indiana that remains from an aborted fetus are indeed human . . . ."[29]  She further explained that "SB 299 makes it harder for the pro-choice crowd" to prevail in the ideological debate over personhood.[30]  The amendments took effect on July 1, 2020.

---

[27] Chelsea Schneider & Tony Cook, *Pence signs new abortion restrictions into law with a prayer*, IndyStar (Mar. 25, 2016, 8:18 p.m.), https://www.indystar.com/story/news/politics/2016/03/24/pence-signs-new-abortion-restrictions-into-law-prayer/82225890/.

[28] Liz Brown, *Sen Brown: Remains from an aborted fetus are human, deserve dignity*, IndyStar (Mar. 2, 2020, 11:18 a.m.), https://www.indystar.com/story/opinion/2020/03/01/sen-brown-remains-aborted-fetus-human-deserve-dignity/4896542002/.

[29] *Id.*

[30] *Id.*

103.     In their current form, the Tissue Disposition Laws have four principal components: (1) treatment and disposition requirements for tissue from an abortion; (2) mandatory counseling and certifications for abortion patients; (3) treatment and disposition requirements for tissue from a miscarriage; and (4) mandatory counseling for miscarriage patients.  The Tissue Disposition Laws do not regulate the disposition of tissue from IVF, and no comparable requirements are imposed on patients or healthcare providers who utilize IVF.

104.     For purposes of the Tissue Disposition Laws, Indiana defines the term "fetus" as "an unborn child, irrespective of gestational age or the duration of the pregnancy."  Ind. Code § 16-18-2-128.7.  This is confusing and misleading because, based on the medical definition of "fetus," the fetal phase of pregnancy does not begin until eleven weeks LMP.[31]  Prior to that point, no fetus or fetal tissue is present in the uterus.  The overwhelming majority of tissue resulting from abortions and miscarriages in Indiana is tissue from blastocysts and embryos.

105.     Under Indiana law, the term "pathological waste" means "(1) tissues; (2) organs; (3) body parts; and (4) blood or body fluids in liquid or semiliquid form; that are removed during surgery, biopsy, or autopsy."  Ind. Code § 16-41-16-5.  Indiana prescribes certain methods for the proper treatment and disposition of pathological waste, including incineration.  *See* Ind. Code § 16-41-16-3.  Prior to 2016, pathological waste included embryonic and fetal tissue, but the 2016 amendments to the Tissue Disposition Laws excluded such tissue from the definition of pathological waste.  Pub. L. 213-2016, §25, 2016 Ind. Acts at 3118.  As a result, healthcare

---

[31] According to the Health Department's Abortion Informed Consent Brochure, the fetal stage of pregnancy begins even later, at fourteen weeks LMP.  Abortion Informed Consent Brochure at 3.  Eleven weeks LMP is widely recognized in the medical community, however, as the boundary between the embryonic and fetal stages of pregnancy.

providers must now treat human tissue resulting from an abortion or miscarriage management procedure differently from human tissue resulting from any other surgical procedure.

### 1)   Treatment and Disposition Requirements for Tissue from an Abortion

106.   The Tissue Disposition Laws provide that a healthcare facility in "possession of an aborted fetus" must "provide for the final disposition of the aborted fetus."  Ind. Code § 16-34-3-4(a).

107.   A healthcare facility may not treat and dispose of tissue from an abortion through incineration or other methods authorized for pathological waste.  Instead, a healthcare facility may only treat and dispose of tissue from an abortion through interment or cremation.  Ind. Code § 16-34-3-4(a); 410 Ind. Admin. Code 35-2-1.[32]

108.   When providing for the interment or cremation of tissue from an abortion, healthcare providers must adhere to laws governing the disposition of deceased people's bodies. *See, e.g.*, Ind. Code § 16-34-3-4(a) ("The burial transit permit requirements of IC 16-37-3 apply to the final disposition of an aborted fetus . . . ."); Ind. Code § 16-34-3-4(b) ("[A] health care facility [that] conducts the cremation of aborted fetal remains on site . . . must comply with all state laws concerning the cremation of human remains . . . ."); Ind. Code § 16-34-3-4(g) (incorporating by reference Ind. Code §§ 23-14-31-26, 23-14-55-2, 25-15-9-18, 29-2-19-17); Ind. Code § 23-14-31-26 (prescribing the circumstances in which a person may authorize the cremation and final disposition of a "decedent"); Ind. Code § 23-14-55-2 (prescribing the authority of a cemetery owner to "inter, entomb, or inurn the body or cremated remains of a deceased human"); Ind. Code § 25-15-9-18 (prescribing the priority of people who "have the authority to designate

---

[32] This is so even if the healthcare facility transports the tissue out of state for disposition.  *See* Ind. Code § 16-34-2-6(c).

the manner, type, and selection of the final disposition of human remains, to make arrangements for funeral services, and to make other ceremonial arrangements after an individual's death"); Ind. Code § 29-2-19-17 (prescribing who has "[t]he right to control the disposition of a decedent's body, to make arrangements for funeral services, and to make other ceremonial arrangements after an individual's death").

109.    In addition, absent extraordinary circumstances, "a burial transit permit . . . that includes multiple fetal remains must be accompanied by a log prescribed by the [Health Department] containing the following information about each fetus included under the burial transit permit: (1) The date of the abortion[;] (2) Whether the abortion was surgical or induced by an abortion inducing drug[;] (3) The name of the funeral director licensee who will be retrieving the aborted fetus[;] (4) In the case of an abortion induced by an abortion inducing drug: (A) whether the pregnant woman will cremate or inter the fetus, or will return the fetus to the health care facility or abortion clinic for disposition; and (B) if the pregnant woman returns the fetus to the health care facility or abortion clinic, whether the returned fetus is included in the burial transit permit."  Ind. Code 16-34-3-4(c).[33]

110.    A healthcare facility subject to the Tissue Disposition Laws "must keep a copy of the burial transit permit and accompanying log in a permanent file."  Ind. Code § 16-34-3-4(c).

111.    "Each time the fetal remains are transported from one entity to another for disposition, the entity receiving the fetal remains must confirm that the number of fetal remains matches the information contained in the burial transit permit and accompanying log.  After final disposition, a copy of the log will be sent back to the health care facility or abortion clinic.  The

---

[33] A copy of the log prescribed by the Health Department, State Form 56981, is available under the heading "Abortion Disposition Log," at https://www.in.gov/isdh/20133.htm.

final log will be attached to the original log . . . and will be made available for review by the [Health Department] at the time of inspection."  Ind. Code § 16-34-3-4(d).

112.    A healthcare facility subject to the Tissue Disposition Laws "is responsible for demonstrating" its compliance to the Health Department.  Ind. Code § 16-34-3-4(e); *see also* 410 Ind. Admin. Code 35-2-1(b) ("The facility must have written policies and procedures for the available method or methods of disposition of aborted fetuses."); 410 Ind. Admin. Code 35-2-1(c) ("The facility must maintain evidentiary documentation demonstrating the date and method of disposition for each aborted fetus.").

113.    Within ten business days after an abortion is performed, a healthcare facility must either "conduct the final disposition" of the resulting tissue in accordance with the Tissue Disposition Laws or "ensure" that the tissue "is preserved until final disposition . . . occurs."  Ind. Code § 16-41-16-7.6(b).

114.    Aspiration abortion patients may elect to have the healthcare facility dispose of the tissue from their abortion, in which case the facility may choose between interment and cremation. Ind. Code § 16-34-3-2(a).  Patients may inquire about which method a facility will use, but they are not entitled to direct a facility to use one method rather than the other.  *See id.*

115.    Alternatively, aspiration abortion patients may elect to take possession of the tissue from their abortion and dispose of it on their own.  *See* 410 Ind. Admin. Code 35-2-1(d).  A patient who does so "is responsible for the costs related to the final disposition."  Ind. Code § 16-34-3-3.

116.    Medication abortion patients typically expel the tissue from their abortions at home, into either a sanitary napkin or toilet.  The Tissue Disposition Laws permit patients to discard those sanitary napkins in the trash and to flush tissue into the sewer.  They require patients to consider,

however, interring or cremating the tissue or bringing it to the healthcare facility where they received abortion care.  *See* Ind. Code § 16-34-3-2(b), (e).

117.    Abortion patients who are minors must obtain parental consent for their disposition choice unless excused from this requirement by a court order.  Ind. Code § 16-34-3-2(c).

118.    Reckless violation of the burial transit permit requirements constitutes a Class B misdemeanor, Ind. Code § 16-37-3-16, which is punishable by up to 180 days in jail and a $1,000 fine, Ind. Code § 35-50-3-3.

119.    Reckless violation of the abortion tissue disposition requirements likewise constitutes a Class B misdemeanor.  Ind. Code § 16-41-16-11.  Any violation of the requirements is punishable by civil penalties of up to $1,000 per day.  Ind. Code § 16-41-16-10(a).

120.    The Health Department may take action against the license of a healthcare facility such as Women's Med for violating the abortion tissue disposition requirements and/or impose a civil penalty of up to $10,000 per day.  *See* Ind. Code § 16-41-16-10(b); *see also* Ind. Code 16-21-3-1; 410 Ind. Admin. Code 26-2-8(a).

121.    Licensed healthcare practitioners such as Dr. Haskell, Ms. Herr, and Ms. McKinney are subject to professional discipline for violating the abortion tissue disposition requirements.  Ind. Code § 25-1-9-4(a)(3).

### 2)  Mandatory Counseling and Certifications for Abortion Patients

122.    The Tissue Disposition Laws require that abortion providers or their delegates counsel their patients about tissue disposition options using a biased and misleading form developed by the Health Department.  *See* Ind. Code § 16-34-2-1.1(a)(2)(H)-(J).[34]

---

[34] The "Disposition of Aborted Fetus Certification" form currently in use by the Health Department, State Form 56114 ("Disposition Certification Form"), is available at https://www.in.gov/isdh/25199.htm.

123.    The mandatory counseling must take place in person at least eighteen hours before the abortion and be conducted both "orally and in writing."  Ind. Code § 16-34-2-1.1(a)(2)(H)-(J).

124.    The counselor must inform all abortion patients, among other things, that they have "a right to determine the final disposition of the remains of the aborted fetus," Ind. Code § 16-34-2-1.1(a)(2)(H), even though most abortion patients end their pregnancies before a fetus has developed, and they do not have the right to elect disposition by a healthcare facility through standard medical means, *see* Ind. Code 16-34-2-1.1(a)(2)(I)(ii).

125.    The counselor must present the patient with a form created by the Health Department to "document[]" the patient's "decision concerning final disposition of the aborted fetus."  Ind. Code § 16-34-2-1.1(a)(2)(H)-(J); *see also* Disposition Certification Form.

126.    After receiving this mandatory counseling, patients must certify, using the Health Department's form, that they have received the required information and disclose the method of disposition they will utilize.  *See* Ind. Code §§ 16-34-3-2(b), 16-34-2-1.1(a)(2)(H)-(J).  If a patient is a minor, their parent or guardian must also complete a certification.  Ind. Code § 16-34-3-2(c).

127.    The form lists three options for disposition and requires patients to elect one of them: (i) "Abortion clinic/health care facility will arrange for burial/cremation of the aborted fetus with a crematorium or funeral home"; (ii) I am choosing a method or location for burial/cremation of the aborted fetus that is different than the abortion clinic/health care facility arrangements and will be responsible for the costs of the burial or cremation, if any"; (iii) "*(For medication abortions only)* I am planning to return the aborted fetus to the abortion clinic/health care facility, which will arrange for burial/cremation of the aborted fetus with a crematorium or funeral home." Disposition Certification Form.

128.    The form implies that the only disposition options available to patients who take possession of their tissue are interment and cremation.  It does not permit patients to indicate that they will dispose of the tissue by other means.  *See* Disposition Certification Form.

129.    Many patients are confused by the form.

130.    Using the same form, abortion providers must certify the following: (i) "At least eighteen (18) hours before the abortion, the patient named above has been informed orally and in writing that she has a right to determine the final disposition of the aborted fetus; provided with information concerning the available options of the aborted fetus; and, if applicable, told which specific method and location of disposition will be used in this case"; (ii) "The patient has determined the disposition of the aborted fetus as selected above"; (iii) "If applicable, the patient's parent or guardian has consented in the patient's determination of disposition of the aborted fetus as selected above"; (iv) "A completed copy of this form has been provided to the patient and, if applicable, to the patient's parent or guardian, and this form will be filed in the patient record." Disposition Certification Form.

131.    A person who knowingly and intentionally performs an abortion without satisfying the counseling and certification requirements commits a Class A infraction, Ind. Code § 16-34-2-7(c), which is punishable by a judgment of up to $10,000, Ind. Code § 34-28-5-4(a).

132.    The Health Department may take action against the license of a healthcare facility such as Women's Med for permitting, aiding, or abetting violations of the counseling and certification requirements and/or impose a civil penalty on the clinic.  *See* Ind. Code § 16-41-16-10(b); *see also* Ind. Code 16-21-3-1; 410 Ind. Admin. Code 26-2-8.

133.    Licensed healthcare practitioners such as Dr. Haskell, Ms. Herr, and Ms. McKinney are subject to professional discipline for violating the counseling and certification requirements. Ind. Code § 25-1-9-4(a)(3).

### 3)  Treatment and Disposition Requirements for Tissue from a Miscarriage

134.    The Tissue Disposition Laws provide that "the parent or parents of a miscarried fetus may determine the final disposition of the remains of the miscarried fetus." Ind. Code § 16-21-11-4.  This provision is misleading.  Miscarriage patients may not utilize the healthcare facilities where they received treatment to dispose of their embryonic or fetal tissue through standard medical means.  *See* Ind. Code §§ 16-21-11-6(b); 16-41-16-7.6.

135.    Like tissue from an abortion, healthcare facilities may only treat and dispose of tissue from a miscarriage through interment or cremation.  *See* Ind. Code §§ Ind. Code §§ 16-21-11-6(b); 16-41-16-7.6.

136.    Within ten business days after a miscarriage occurs, a healthcare facility must either "conduct the final disposition" of the resulting tissue in accordance with the Tissue Disposition Laws or "ensure" that the tissue "is preserved until final disposition . . . occurs." Ind. Code § 16-41-16-7.6(b).

137.    Miscarriage patients may take possession of their embryonic or fetal tissue and dispose of it on their own, but if they choose to do so, they "are responsible for the costs related to the final disposition." Ind. Code § 16-21-11-6(a).

138.    Healthcare facilities are required to obtain burial transit permits before transporting tissue from a miscarriage for disposition. Ind. Code § 16-21-11-6(b).  But healthcare facilities are not required to maintain a detailed log concerning tissue from miscarriages the way they are for tissue from abortions.  *Compare* Ind. Code § 16-21-11-6, *with* Ind. Code § 16-34-3-4(c)-(e).

139.    Reckless violation of the burial transit permit requirements constitutes a Class B misdemeanor, Ind. Code § 16-37-3-16, which is punishable by 180 days in jail and a $1,000 fine, Ind. Code § 35-50-3-3.

140.    Reckless violation of the miscarriage tissue disposition requirements likewise constitutes a Class B misdemeanor. Ind. Code § 16-41-16-11. Any violation of the requirements is punishable by civil penalties of up to $1,000 per day. Ind. Code § 16-41-16-10(a).

141.    The Health Department may take action against the license of a healthcare facility, such as Women's Med, for violating the miscarriage tissue disposition requirements and/or impose a civil penalty. *See* Ind. Code § 16-41-16-10(b); *see also* Ind. Code 16-21-3-1.

142.    Licensed healthcare practitioners such as Dr. Haskell, Ms. Herr, and Ms. McKinney are subject to professional discipline for violating the miscarriage tissue disposition requirements. Ind. Code § 25-1-9-4(a)(3).

### 4)  Mandatory Counseling for Miscarriage Patients

143.    The Tissue Disposition Laws require a healthcare facility to take the following steps within twenty-four hours *after* "a woman has her miscarried fetus expelled or extracted in a health care facility: (i) "disclose to the parent or parents of the miscarried fetus, both orally and in writing, the parent's right to determine the final disposition of the remains of the miscarried fetus"; (ii) "provide the parent or parents of the miscarried fetus with written information concerning the available options for disposition of the miscarried fetus . . ."; and (iii) "inform the parent or parents of the miscarried fetus of counseling that may be available concerning the death of the miscarried fetus." Ind. Code § 16-21-11-5(a).

144.    A miscarriage patient must "inform the health care facility of the parent's decision for final disposition of the miscarried fetus" before being discharged from the facility, and the

healthcare facility "shall document the parent's decision in the medical record."  Ind. Code § 16-21-11-5(b).

145.     Unlike abortion patients and their healthcare providers, neither miscarriage patients nor their healthcare providers are required to make certifications or complete a State-mandated form.  *Compare* Ind. Code § 16-21-11-5, *with* Ind. Code § 16-34-2-1.1(a)(2)(H)-(J).

146.     The Health Department may take action against the license of a healthcare facility, such as Women's Med, for permitting, aiding, or abetting violations of the counseling requirements for miscarriage patients and/or impose a civil penalty on the clinic of up to $10,000 per day.  *See* Ind. Code § 16-21-3-1, § 16-21-3-2(2).

147.     Licensed healthcare practitioners such as Dr. Haskell, Ms. Herr, and Ms. McKinney are subject to professional discipline for violating the counseling requirements for miscarriage patients.  Ind. Code § 25-1-9-4(a)(3).

**D.  Injuries Caused by the Tissue Disposition Laws**

148.     The Tissue Disposition Laws burden the ability of abortion and miscarriage patients to dispose of embryonic fetal tissue through standard medical means.

149.     Medical waste disposal companies generally contract with healthcare facilities and institutions, not individual patients.  It would be difficult, if not impossible, for an individual patient to contract with a medical waste disposal company for disposition of the tissue from a single abortion or miscarriage.

150.     Transporting untreated human tissue from a healthcare facility is burdensome for a lay person and entails risk, including the risk of leakage and contamination.

151.     Some healthcare facilities will not release embryonic and fetal tissue directly to patients because of concerns about potential liability and environmental contamination.

31

152.    The Tissue Disposition Laws treat human tissue resulting from an abortion or miscarriage management procedure differently from human tissue resulting from all other surgical procedures.

153.    From a public health perspective, human tissue resulting from abortions and miscarriages is no different from human tissue resulting from any other surgical procedure.  Prior to treatment, it "is capable of transmitting a serious communicable disease."  Ind. Code § 16-41-16-4(a).

154.    All human tissue contains cells that house a person's complete genome.

155.    Following an abortion or miscarriage, the cells in embryonic and fetal tissue are no longer alive and no longer capable of continued development.

156.    The Tissue Disposition Laws distinguish between human tissue resulting from abortion and miscarriage management procedures and human tissue resulting from all other surgical procedures based on the State's view of personhood.

157.    The Tissue Disposition Laws equate tissue from the earliest stages of pregnancy with the remains of a person.

158.    Personhood is a spiritual concept, not a scientific concept.  It is grounded in religious belief.

159.    Through the Tissue Disposition Laws, Indiana takes sides in a religious debate about whether personhood begins at fertilization.

160.    The Tissue Disposition Laws privilege some people's religious and conscientious beliefs over others.

161.    The Tissue Disposition Laws impose a series of State viewpoints on abortion patients, including that an embryo or fetus is morally equivalent to a person; that abortion and

miscarriage kill a person; and that disposition methods other than burial and cremation are disrespectful.

162.    The Tissue Disposition Laws coerce pregnant people who obtain abortion and miscarriage management care to engage in rituals that are associated with the death of a person.

163.    The Tissue Disposition Laws coerce abortion patients to affirm misleading statements about pregnancy, abortion, personhood, and the status of embryonic and fetal tissue with which they disagree.

164.    The Tissue Disposition Laws coerce abortion patients to affirm statements about pregnancy, abortion, personhood, and the status of embryonic and fetal tissue that offend their religious and conscientious beliefs.

165.    The Tissue Disposition Laws coerce abortion and miscarriage patients to effectuate the State's beliefs about pregnancy, abortion, personhood, and the status of embryonic and fetal tissue.

166.    The Tissue Disposition Laws deprive abortion and miscarriage patients of the moral agency to act in accordance with their own views about pregnancy, abortion, personhood, and the status of embryonic and fetal tissue, thereby undermining their dignity.

167.    The Tissue Disposition Laws are causing abortion and miscarriage patients to experience trauma, guilt, shame, anger, and feelings of exploitation and violation.

168.    The Tissue Disposition Laws increase the stigma that some abortion and miscarriage patients experience by sending a message that those patients are responsible for the death of a person.

169.    The harms caused by the Tissue Disposition Laws are amplified by the life circumstances of the individuals they impact.

170.    For abortion providers like Women's Med, compliance with the Tissue Disposition Laws is difficult and expensive.

171.    The Tissue Disposition Laws make the availability of abortion services contingent on the ability and willingness of third-party vendors to bury or cremate the ashes of embryonic and fetal tissue.

172.    It is not feasible for Indiana abortion clinics to cremate embryonic and fetal tissue on site.  The equipment and personnel needed to do so is prohibitively expensive.

173.    Few funeral homes and crematories in Indiana are willing and able to cremate and/or inter embryonic and fetal tissue from abortion clinics.  Those that are can charge exorbitant fees because they know that abortion providers are required to utilize their services.

174.    The Tissue Disposition Laws require Women's Med to dedicate significant amounts of time and money to complying with their requirements.  This diverts resources from patient care.

175.    The Tissue Disposition Laws chill new providers from offering abortion care by subjecting abortion providers to significant criminal and financial liability for mistakes in complying with a complex and onerous regulatory system.

176.    The Tissue Disposition Laws threaten to increase the cost and decrease the availability of abortion care to an extent that creates a substantial obstacle to abortion access.

177.    The Tissue Disposition Laws force abortion providers to make statements that are biased in favor of certain religious and conscientious beliefs.

178.    The Tissue Disposition Laws force abortion providers to inter or cremate embryonic and fetal tissue, symbolic rites that are associated with the bodies of deceased persons.

34

179.    In the context of the Tissue Disposition Laws, interment and cremation of embryonic and fetal tissue are forms of expressive conduct.  The purpose of the conduct is to *signify* respect for human tissue resulting from abortion and miscarriage management procedures because, in the State's view, it should  be treated like the remains of a person.

180.    The Tissue Disposition Laws require abortion providers and their delegates, including Dr. Haskell, Ms. Herr, and Ms. McKinney, to convey information to their patients that is untruthful or misleading.  For example, abortion providers must present their patients with a form that describes the tissue resulting from their abortions as an "aborted fetus" even though the overwhelming majority of Indiana abortions take place during the embryonic stage of pregnancy.[35] Similarly, abortion providers must inform their patients orally and in writing that they "have a right to determine the final disposition of the aborted fetus," even though the Tissue Disposition Laws prohibit patients from utilizing their abortion clinic to dispose of the tissue by standard medical means, making it virtually impossible for patients to elect final disposition by standard medical means.  Likewise, abortion providers must compel their patients to certify the means by which they "have decided to dispose of the aborted fetus" using a form that does not list all lawful options.

181.    Although Indiana labels the counseling and certification requirements as "informed consent" requirements, they are not related to the standard informed consent process in medicine, which entails informing a patient about the risks, benefits, and alternatives associated with a particular medical intervention and then obtaining the patient's consent to proceed with the intervention.

---

[35] *See* Disposition Certification Form.

182.    The Tissue Disposition Laws interfere in healthcare providers' ability to provide patient-centered care to abortion and miscarriage patients.

183.    The Tissue Disposition Laws require healthcare providers who treat abortion and miscarriage patients, including Dr. Haskell, Ms. Herr, and Ms. McKinney, to engage in speech and expressive conduct to which they object.

184.    The Tissue Disposition Laws coerce abortion and miscarriage patients to engage in speech and expressive conduct to which they object.

## CLAIMS

### COUNT I
### (Substantive Due Process)

185.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 184.

186.    The Tissue Disposition Laws impose an undue burden on abortion access.

187.    The Tissue Disposition Laws impose an undue burden on access to treatment for miscarriage.

188.    Accordingly, the Tissue Disposition Laws violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

### COUNT II
### (Equal Protection)

189.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 184.

190.    The Tissue Disposition Laws treat patients and healthcare providers seeking to dispose of human tissue from abortion or miscarriage management procedures differently from patients and healthcare providers seeking to dispose of human tissue from any other surgical procedures.

36

191.    The Tissue Disposition Laws treat patients and healthcare providers seeking to dispose of embryonic tissue resulting from an abortion or miscarriage management procedure differently from patients and healthcare providers seeking to dispose of embryonic tissue resulting from IVF.

192.    The Tissue Disposition Laws treat abortion patients differently from miscarriage patients.

193.    The differential treatment described above burdens the fundamental rights of abortion and miscarriage patients and their healthcare providers.

194.    Although Indiana has a valid interest in proper disposition of embryonic and fetal tissue, it does not have a valid interest in treating abortion and miscarriage patients differently from each other and differently from IVF patients.

195.    Although Indiana has a valid interest in proper disposition of embryonic and fetal tissue, it does not have a valid interest in treating healthcare providers who provide abortion and miscarriage management care differently from one another and differently from healthcare providers who provide IVF.

196.    Accordingly, the Tissue Disposition Laws violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

### COUNT III
### (Free Speech)

197.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 184.

198.    The Tissue Disposition Laws compel healthcare providers who treat abortion and miscarriage patients to engage in speech and expressive conduct to which they object.

199.    The Tissue Disposition Laws coerce abortion and miscarriage patients to engage in speech and expressive conduct to which they object.

200.    Accordingly, the Tissue Disposition Laws violate the Free Speech Clause of the First Amendment to the U.S. Constitution.

## COUNT IV
### (Establishment of Religion)

201.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 184.

202.    The Tissue Disposition Laws advance religious beliefs about pregnancy, abortion, personhood, and the nature of embryonic and fetal tissue.

203.    The Tissue Disposition Laws coerce certain healthcare providers and patients to effectuate the state's beliefs about pregnancy, abortion, death, and dignity.

204.    The Tissue Disposition Laws coerce certain healthcare providers and patients to participate in conduct that is religious in nature.

205.    The Tissue Disposition Laws are motivated by religious considerations.

206.    The Tissue Disposition Laws have the primary effect of advancing religion and lack a secular purpose.

207.    Accordingly, the Tissue Disposition Laws violate the Establishment Clause of the First Amendment to the U.S. Constitution.

## COUNT V
### (Free Exercise of Religion)

208.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 184.

209.     The Tissue Disposition Laws burden the sincerely held religious and conscientious beliefs of some abortion and miscarriage patients.

210.     The Tissue Disposition Laws are not neutral with respect to religion, and they are not generally applicable.

211.     Accordingly, the Tissue Disposition Laws violate the Free Exercise Clause of the First Amendment to the U.S. Constitution.

**REQUEST FOR RELIEF**

212.     Plaintiffs respectfully request that this Court:

a.     Permanently enjoin the Tissue Disposition Laws, Ind. Code §§ 16-21-11-1 to 16-21-11-6; 16-34-2-1.1(a)(2)(H)-(J); 16-34-2-1.1(a)(3)(A); 16-34-2-6(b)-(c); 16-34-3-1 to 16-34-3-6; 16-41-16-4(d); 16-41-16-5; 410 Ind Admin. Code 35-1-1 to 35-2-1.

b.     Permanently enjoin any provision or application of the Tissue Disposition Laws that Plaintiffs demonstrate to be unconstitutional.

c.     Issue a declaratory judgment that the Tissue Disposition Laws, Ind. Code §§ 16-21-11-1 to 16-21-11-6; 16-34-2-1.1(a)(2)(H)-(J); 16-34-2-1.1(a)(3)(A); 16-34-2-6(b)-(c); 16-34-3-1 to 16-34-3-6; 16-41-16-4(d); 16-41-16-5; 410 Ind Admin. Code 35-1-1 to 35-2-1, are unconstitutional in whole or in part.

d.     Award Plaintiffs attorney's fees and costs pursuant to 42 U.S.C. § 1988; and/or

e.     Grant such other and further relief as the Court may deem just, proper, and equitable.

Dated: December 21, 2020

Respectfully submitted,

*/S/ Kathrine D. Jack*
Kathrine D. Jack
JACK LAW OFFICE LLC
One Courthouse Plaza
P.O. Box 813
Greenfield, IN 46140
Phone: (317) 477-2300
Fax: (317) 515-6377
kjack@jacklawoffice.com

Sneha Shah*
Stephanie Toti
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
Phone: (646) 490-1083
sshah@lawyeringproject.org
stoti@lawyeringproject.org

Melissa Shube*
LAWYERING PROJECT
712 H Street NE, Suite 1616
Washington, D.C. 20002
Phone: (646) 480-8942
mshube@lawyeringproject.org

Michelle Engel
P.O. Box 6954
South Bend, IN 46660
Phone: (269) 409-1194
michelle.l.engel@icloud.com

Priscilla Joyce Smith*
YALE LAW SCHOOL RRJP CLINIC
319 Sterling Pl.
Brooklyn, NY 11238
Phone: (347) 262-5177
priscilla.smith@yale.edu

*Attorneys for Plaintiffs*

*Application for admission *pro hac vice* forthcoming